707 S.E.2d 451

**The STATE, Respondent,**

v.

**Timothy L. WALLACE, Appellant.**

No. 4800.

Court of Appeals of South Carolina.

Heard Nov. 3, 2010.

Decided March 2, 2011.

Rehearing Denied April 21, 2011.

---

3. We decide this case without oral argument pursuant to Rule 215, SCACR.

Appellate Defender Elizabeth A. Franklin–Best, of Columbia; for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Attorney General Salley W. Elliott, Assistant Attorney General Deborah R.J. Shupe, Office of the Attorney General, all of Columbia; and Solicitor Christina T. Adams, of Anderson; for Respondent.

FEW, C.J.

Timothy L. Wallace appeals his conviction and twenty-five year sentence for trafficking cocaine. His primary contention

is that the arresting officer did not have reasonable suspicion to detain him after the conclusion of a traffic stop, and thus that the trial judge erred in not suppressing evidence seized during the subsequent search. He also contends the judge erred in not suppressing a statement he made to the officer just before the drugs were found and in not granting a mistrial. We affirm.

## I. Facts

Corporal Thomas Crompton of the Oconee County Sheriff's Office stopped Wallace on Interstate 85 for driving his car left of the center line. During the approximately twelve minutes it took Crompton to complete the traffic stop, he made numerous observations that led him to suspect that Wallace was engaged in serious criminal activity. Crompton issued Wallace a traffic ticket, but he continued to question him. He asked if there was anything illegal in the car and sought consent to search it. Wallace did not answer the question about anything illegal, and he refused several times to give consent to search. Crompton then said "hang tight just a second" and retrieved a drug-sniffing dog from his patrol vehicle. At that point, Wallace was detained a second time and not free to leave.[1] When Crompton walked the dog around Wallace's car, the dog alerted on the driver's door and the trunk. Crompton then searched the car. As he pulled bags out of the back, he asked who owned each bag. Wallace claimed ownership of a bag in which Crompton discovered 752 grams of cocaine.

After Crompton found the cocaine, Sergeant Dale Colegrove, who had been called to the scene for backup, read Wallace his *Miranda*[2] warnings. Wallace agreed to speak to Colegrove without an attorney present. Wallace told him that he had picked up the cocaine and was delivering it to someone

---

1. Wallace does not contend the second detention began until Crompton said "hang tight." During the suppression hearing, trial counsel stated, referring to the "hang tight" directive: "At that point the traffic stop ended and this turns into another type of stop where the officer has to have some sort of a reasonable and articulable suspicion of continuing criminal activity."

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

in North Carolina. Wallace was arrested and later indicted for trafficking more than 400 grams of cocaine.[3]

## II. Applicable Law

Wallace concedes there was probable cause for the traffic stop. The State concedes Wallace was detained a second time while Crompton used the drug dog and then searched the car. These concessions narrow the issue before us to whether Crompton's suspicion that Wallace was engaged in serious criminal activity was reasonable under the Fourth Amendment based on information available to Crompton at the time he told Wallace to "hang tight."

In *State v. Tindall,* 388 S.C. 518, 698 S.E.2d 203 (2010), a majority of our supreme court summarized the basic principle that the Fourth Amendment prevents a police officer from detaining a suspect after the conclusion of a valid traffic stop "unless the officer has reasonable suspicion of a serious crime." 388 S.C. at 521, 698 S.E.2d at 205 (citing *United States v. Sullivan,* 138 F.3d 126, 131 (4th Cir.1998)). However, " '[r]easonable suspicion' . . . defies precise definition." *United States v. McCoy,* 513 F.3d 405, 411 (4th Cir.2008). In *McCoy,* the Fourth Circuit restated the classic passage from *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), concerning the difficulty courts find in applying the requirement of reasonableness to the unique facts of a case: "Far from being susceptible to a 'neat set of legal rules,' [reasonable suspicion] is . . . a 'commonsense, nontechnical conception [ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* (quoting *Ornelas,* 517 U.S. at 695–96, 116 S.Ct. 1657); *see also United States v. Branch,* 537 F.3d 328, 336 (4th Cir.2008) (quoting *Ornelas*). In this highly fact-specific inquiry,[4] reasonable suspicion "is a fluid concept which takes its substantive content from the particular context in which the standard is being

---

3. Sergeant Colegrove testified that after Wallace was arrested, he took Wallace back to the sheriff's office and made some phone calls in an attempt to corroborate what Wallace told him and to make the intended delivery. Wallace cooperated in that effort, but it was not successful.

4. *Tindall,* 388 S.C. at 527, 698 S.E.2d at 208 (Kittredge, J., dissenting).

assessed." *United States v. Foreman,* 369 F.3d 776, 781 (4th Cir.2004). The law summarized above is well settled; the application of the law to a specific set of facts in an individual case can be unsettling.

There are several important principles, however, that assist courts in the analysis. In *Branch,* the Fourth Circuit stated "it is entirely appropriate for courts to credit 'the practical experience of officers who observe on a daily basis what transpires on the street.'" 537 F.3d at 336–37 (quoting *United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993)). Our own court has noted that in reviewing a particular case, "the court must consider the totality of the circumstances." *State v. Willard,* 374 S.C. 129, 134, 647 S.E.2d 252, 255 (Ct.App.2007). Factors that are alone consistent with "innocent travel" can, when "taken together" produce a reasonable suspicion of criminal activity. *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In applying the concept of reasonable suspicion to the various facts of a case, "[i]t is the entire mosaic that counts, not single tiles." *United States v. Whitehead,* 849 F.2d 849, 858 (4th Cir.1988).

### III. Application of Law to Facts

We begin our discussion of the reasonableness of Corporal Crompton's suspicion that Wallace was engaged in serious criminal activity by noting that Crompton was an experienced officer. Over the ten years he worked in law enforcement before this arrest he had been continually trained, including education in drugs and drug interdiction. In his testimony at the suppression hearing, Crompton described in detail what happened, what he observed, and the conclusions he drew from those facts. From this testimony and from the totality of the circumstances of this case, we find ample evidence to support the trial judge's ruling that Crompton's suspicion was reasonable under the Fourth Amendment. This evidence, which is described below, is sufficient to require that we affirm under our deferential standard of review. *Compare Tindall,* 388 S.C. at 521, 523 n. 5, 698 S.E.2d at 205, 206 n. 5 with *Tindall,* 388 S.C. at 524–25, 527, 698 S.E.2d at 206–07, 208 (Kittredge, J., dissenting) (describ-

ing the standard of review as "clear error" or "any evidence.")

When Crompton activated his blue lights to make the traffic stop, Wallace "hit his brakes, then he let off his brakes and got right at the exit ramp ... and then hit his brakes again, and then drove halfway up the exit ramp before he decided to get on the shoulder of the road." This "spark[ed] [Crompton's] attention that there might be something else going on." After asking Wallace for his license, registration, and proof of insurance, Crompton noticed he was "fumbling around" and it took him approximately two minutes to collect all of the documents, which is a longer period of time than Crompton testified is normal. During this time, the passenger in Wallace's car looked straight ahead, did not help Wallace locate any of the paperwork, and did not acknowledge Crompton's presence.

Crompton asked Wallace to step out of the car and sit in the passenger's side of his patrol vehicle, while the passenger remained in Wallace's car. Crompton asked Wallace where he was coming from, and he answered, "Atlanta," [5] but could not tell him how many days he spent there. He appeared to get progressively more nervous as he spoke, instead of gradually relaxing, which Crompton observed is the normal reaction.[6] When he ran Wallace's driver's license, the report indicated that he had a previous alcohol related violation. Crompton asked him about the violation, and Wallace went into detail about the event and continued to talk nervously, which Crompton described as "nervous chitter." [7]

During their conversation, a black BMW pulled up approximately seventy-five yards behind the area where Wallace was pulled over. The car remained for approximately two minutes and then drove away. After seeing the BMW, Crompton

---

**5.** Crompton testified Atlanta is a "hub city" where drugs are distributed and Interstate 85 is a known drug corridor.

**6.** Crompton testified that Wallace's nervousness was visible on the video of the traffic stop, the relevant portion of which was shown to the trial judge.

**7.** The alcohol violation itself is of no significance to our analysis. We include it only as context for Crompton's testimony about the "nervous chitter."

walked from his patrol vehicle over to Wallace's car to speak to the passenger. As soon as Crompton approached the door of the car, a cell phone in the car started ringing. Crompton found this odd and consistent with drug trafficking activity because drug traffickers use decoy cars and call each other on cell phones during delivery trips. Crompton asked the passenger questions, but he would "hardly look" at Crompton and was sweating. Crompton testified that though it was noon in mid-September, Crompton was not sweating—even wearing "a bullet-proof vest and everything else." As the passenger handed Crompton his identification card, the card was "moving up and down in a rapid manner," indicating to Crompton that he was nervous. The passenger said he and Wallace were coming from a baby shower in Atlanta, where they stayed for one day. Wallace had not mentioned a baby shower.

Crompton walked back to his patrol vehicle to ask Wallace a few more questions. Crompton testified Wallace said "he didn't know how many days he stayed [in Atlanta]. He told me one, then he told me two, then two days and one night." He began to explain the traffic ticket to Wallace and asked him where he lived. At that point, Wallace told Crompton he was actually not traveling from Atlanta, but was coming from "Lavonia or Lithonia." [8]

As Crompton finished explaining the ticket, Wallace "was actually looking out the window towards the woods . . . almost to the point that if he could have got out of the car, . . . he would have been gone." He described Wallace at that point as "real defensive." Crompton asked if there was anything illegal in the car. Wallace did not answer and "wouldn't look at [him], he threw a wall up and that was it." Crompton then asked several times if he could search the car. Wallace said "if the vehicle was his, he would give [Crompton] permission to search it; but due to the vehicle not being his . . . he couldn't give that to [him]." [9]

---

8. Crompton testified he couldn't tell whether Wallace said Lavonia or Lithonia, but both are reasonably near Atlanta. Regarding the discrepancy, however, Crompton testified: "If I go to Atlanta, I know I'm in Atlanta. . . . And if I get stopped and somebody asks me where I'm coming from, if I go to Lithonia, then I know I've been to Lithonia."

9. A female who was not present was listed as the owner of the car.

In its brief, the State summarizes all of this evidence in the following fourteen points:

(1) after he activated his blue lights, Wallace hit the brakes, let off the brakes, got right to the exit ramp, then hit the brakes again and drove halfway up the exit ramp before pulling off the road, all of which was outside the normal behavior for traffic stops; (2) Wallace fumbled around for his license and the car paperwork for longer than the normal time in routine traffic stops; (3) the passenger (Hood) stared straight ahead and did not even acknowledge Cpl. Crompton's presence; (4) Wallace and Hood gave different accounts of their travel time and itinerary; (5) rather than calming down, Wallace became increasingly nervous during his discussions with Cpl. Crompton; (6) a black BMW pulled up behind Cpl. Crompton's patrol car on the side of the exit ramp, sat there for a couple of minutes and then drove away as Cpl. Crompton was walking toward Wallace's car to talk with Hood; (7) as Cpl. Crompton approached the car to talk with Hood, a cell phone on the seat next to Hood started ringing but Hood did not answer it; (8) drug dealers frequently use decoy cars and communicate via cell phones when transporting drugs; (9) Hood would not look at Cpl. Crompton when they were talking; (10) Hood was sweating even though it was a mild day, and he was visibly nervous; (11) after Cpl. Crompton spoke to Hood, Wallace changed his story about where they had been and how long they were there; (12) the car Wallace was driving belonged to a third party who was not present, which is common in drug cases; (13) I–85 is a known drug corridor; and (14) Atlanta is a known drug source/hub city.

While none of these items independently amounts to a reasonable suspicion of criminal activity, blending each of these "tiles" into the "entire mosaic" of the totality of the circumstances, we believe Crompton had reasonable suspicion to detain Wallace while he walked the drug dog around the car. Thus, the trial judge ruled correctly to deny the motion to suppress the cocaine.

## IV. Other Issues

Wallace argues the trial judge should not have allowed into evidence Wallace's statement that the bag containing

cocaine belonged to him. Wallace requested and the judge conducted a *Jackson v. Denno*[10] hearing at the beginning of Sergeant Colegrove's testimony. However, Corporal Crompton had already testified without objection that Wallace made the statement identifying the bag as his. As the trial judge observed during the hearing, "I can't do anything about something that's already happened." This issue is not preserved because the evidence had already been presented to the jury before Wallace made any objection to it. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693–94 (2003).

Wallace also challenges the denial of his motion for mistrial. After deliberation began, the jury requested that a portion of the videotape of the traffic stop be replayed. The part replayed included footage not previously shown to the jury of Wallace telling Corporal Crompton he had a prior drug conviction. The trial judge determined that the error was harmless and denied the motion because Wallace had testified about the same conviction during his direct examination. "A mistrial should not be granted except in cases of manifest necessity and ought to be granted with the greatest caution for very plain and obvious reasons." *State v. Wasson*, 299 S.C. 508, 510, 386 S.E.2d 255, 256 (1989). "A trial judge's ruling on a motion for mistrial will not be disturbed absent an abuse of discretion amounting to an error of law." *State v. Sparkman*, 358 S.C. 491, 495, 596 S.E.2d 375, 377 (2004). The judge's ruling was within his discretion.

## V. Conclusion

The trial judge was correct to rule that the arresting officer had reasonable suspicion to detain Wallace long enough to walk the drug dog around his car. Wallace's argument regarding his statement claiming ownership of the bag is not preserved for our review. The judge acted within his discretion in denying Wallace's motion for a mistrial.

**AFFIRMED.**

SHORT and WILLIAMS, JJ., concur.

---

**10.** 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).