746 S.E.2d 352

**The STATE, Respondent,**

v.

**Ashley Eugene MOORE, Appellant.**

**Appellate Case No. 2011–191327.**
**No. 5160.**

Court of Appeals of South Carolina.

Heard April 2, 2013.
Decided July 17, 2013.

636

Appellate Defender Dayne C. Phillips, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General Julie Kate Keeney, all of Columbia, for Respondent.

LOCKEMY, J.

Ashley Eugene Moore was convicted and sentenced for the charges of trafficking cocaine base and possession of a weapon during the commission of a violent crime. On appeal, he argues the trial court erred in denying his motion to suppress evidence discovered during a traffic stop. Specifically, he argues his continued detention was unlawful because the State did not present sufficient evidence to establish the police officer's reasonable and articulable suspicion of a serious crime. We reverse.

**FACTS**

Officers Dale Owens and Donnie Gilbert, Corporal Ken Hancock, and K–9 handler Deputy Jason Carraway, all with the Spartanburg County Sheriff's Office, were observing traffic along the I–85 corridor in Spartanburg County the evening of June 30, 2010. Around 1:10 a.m., Officer Owens observed Moore traveling at a rate above the posted speed limit of 60 miles per hour. Officer Owens began pacing Moore's vehicle [1] and determined Moore was keeping a steady speed of 70 miles per hour. Further, Moore failed to maintain his lane and crossed into the center lane from the far right-hand lane. Officer Owens initiated his blue lights, and Moore first activated his left turn signal, then his right turn signal. Officer Owens, found those actions were an indicator that Moore might be preparing to flee. Officer Owens testified Moore also took longer than the average time to stop and that is consistent with people who have tried to run from him in the past. After stopping his vehicle, Moore failed to release his left turn signal, and Officer Owens opined this failure indicat-

---

1. Pacing is a method of measuring the speed of another vehicle. The officer maintains the same distance and speed behind the other vehicle for a period of time, and judging from the certified speedometer in the officer's car, the officer determines the other vehicle's speed.

ed Moore's heart rate might be so accelerated he had temporarily lost his hearing capability.

When Officer Owens approached Moore's vehicle, Moore was talking on a cell phone, and Officer Owens requested Moore end the call. Officer Owens opined the average person would end a phone a call when an officer approached their vehicle. He added that drug traffickers may stay on the phone to report to a superior who needs to hear what is happening during the stop. An alcohol odor emanated from Moore's vehicle, and Moore admitted to having a couple of drinks. Officer Owens had worked on several cases in which drug traffickers were drinking alcohol, and he maintained the alcohol calmed their nerves. Moore further informed Officer Owens the vehicle was a rental and provided the rental agreement along with his driver's license. Officer Owens observed Moore's hand shaking heavily, which Officer Owens opined was a measurement of Moore's nervousness. Also during that time, Officer Owens observed Moore's carotid artery and his breathing, and consequently stated he discerned Moore's pulse and breathing were accelerated, indicating nervousness.

Moore picked up his cell phone as he obeyed a request to exit his vehicle, which Officer Owens opined was an indicator of criminal activity because the cell phone is a person's device for communication when he tries to flee. Moore then lit a cigarette as he stood outside his vehicle, and Officer Owens explained that based on his training, people sometimes light cigarettes to calm their nerves. Moore agreed to a pat-down and voluntarily raised his hands to his head, which is a position known as the "felony position." Officer Owens felt what he perceived to be a large sum of wadded money. Moore moved the money from his front pocket to his back pocket, and Officer Owens said another alarm was triggered because Moore said he was unemployed. Officer Owens estimated the wad of money to be around one thousand dollars when he initially saw it, but subsequently, it was determined to be about six hundred dollars. Moore again admitted he had been drinking and placed his hands in his pockets with his head down, in a position Officer Owens described as a "defeated look." Officer Owens opined this action is used to dissipate nervous energy.

Moore was traveling from Lawrenceville, Georgia, which is a suburb of Atlanta, Georgia, to see his grandmother in Marion, North Carolina. Officer Owens testified ninety percent of the people he has arrested in major criminal drug cases have come from Atlanta. It raised some questions for Officer Owens when Moore explained he was traveling to visit his grandmother at one o'clock in the morning, especially after drinking. During questioning, Moore stated a third-party had rented the vehicle. Officer Owens explained third-party rental vehicles are one of the largest indicators of criminal activity in criminal patrol on the interstate. Officer Moore administered field sobriety tests to determine if Moore was impaired, and Moore passed two out of three. Officer Owens found Moore was not impaired and asked Moore if there was any alcohol in the vehicle. Moore denied having any alcohol, weapons, or drugs in the vehicle. Officer Owens also asked Moore if he could search the vehicle, but Moore declined consent.

Subsequently, Officer Owens decided to issue a warning ticket to Moore because he felt it would have been an injustice to arrest Moore for driving under the influence. However, he decided to detain Moore until the K–9 drug detection unit could arrive. Officer Carraway arrived after about fifteen minutes, a total of thirty-two minutes since the beginning of the traffic stop. Officer Carraway's dog alerted to an odor inside the car, and the officers searched the vehicle. A bottle of alcohol was found under the front passenger seat of the vehicle, and contraband consistent with crack cocaine was found in two containers in a bag in the trunk of the vehicle. They also found a semiautomatic weapon and a bundle of currency. Moore was then arrested.

On October 22, 2010, Moore was indicted for trafficking cocaine base, first offense, and possession of a weapon during the commission of a violent crime. The case went to trial on April 25, 2011. The State cited *State v. Provet,* 391 S.C. 494, 706 S.E.2d 513 (Ct.App.2011), *cert. granted,* Oct. 3, 2012, in support of its argument that Officer Owens had reasonable suspicion to further detain Moore beyond the scope of the initial traffic stop. It listed the following facts in support of finding a lawful detention: (1) Moore turned on his left turn signal when he was intending to turn right; (2) there was a

distinctive odor of alcohol coming from Moore's vehicle; (3) Moore smoked two cigarettes during the traffic stop; (4) Moore failed to hang up his cell phone when Officer Owens approached; (5) Moore appeared nervous, evidenced by his shaky hands, rapid pulse, and heavy breathing; (6) Moore attempted to pick up his cell phone when Officer Moore asked him to exit the vehicle; (7) Moore had a large wad of cash on his person even though he stated he was unemployed; (8) Moore drove a vehicle rented by a third-party; (9) Moore was driving from Atlanta, a known hub for drug trafficking; and (10) Moore stated he was going to his grandmother's house, but it was already 1 a.m.

After hearing both parties' arguments and reviewing relevant case law, the trial court stated

> In particular, the problem I have with the or the facts that are revealed by the rental agreement indicate the rental in North Carolina on the evening, afternoon before the stop was made at one o'clock in the morning. I have my doubts that the car was driven from Morganton to Lawrenceville and back to Marion to visit a grandmother. Morganton and Marion is a much shorter trip than that.

> So, it. appears that he may have been less than truthful about the purpose of his trip. Also, for someone unemployed, to be carrying such a large amount of cash in their pocket also would obviously give [an] officer reasonable suspicions. The other factors as noted, I have given those the weight required, and in this case I am going to refuse to suppress.

The trial proceeded and Moore was convicted of both charges. He was sentenced to twenty-five years on his trafficking charge as well as five years on his possession charge, and the sentences were to run concurrently. This appeal followed.

## STANDARD OF REVIEW

■ "In Fourth Amendment cases, the trial court's factual rulings are reviewed under the 'clear error' standard." *Provet*, 391 S.C. at 498, 706 S.E.2d at 515 (citing *State v. Brockman*, 339 S.C. 57, 66, 528 S.E.2d 661, 666 (2000)). "Under the clear error standard, an appellate court will not reverse a trial court's findings of fact simply because it would have decided the case differently." *Id.* (internal quotations omitted) (citing

*State v. Pichardo,* 367 S.C. 84, 96, 623 S.E.2d 840, 846 (Ct.App.2005)). "Therefore, we will affirm if there is any evidence to support the trial court's rulings." *Id.* (citing *State v. Khingratsaiphon,* 352 S.C. 62, 70, 572 S.E.2d 456, 460 (2002)).

## LAW/ANALYSIS

■ "The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . .' " *Id.* at 499, 706 S.E.2d at 515 (alteration in original) (quoting U.S. Const. amend. IV). "Generally, the decision to conduct a traffic stop is [a] reasonable [seizure] when the police have probable cause to believe a traffic violation has occurred." *Id.* at 499, 706 S.E.2d at 515–16 (citing *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

■ "Lengthening the detention for further questioning beyond that related to the initial stop is acceptable in two situations: (1) the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter." *Id.* at 500, 706 S.E.2d at 516 (citing *Pichardo,* 367 S.C. at 99, 623 S.E.2d at 848). "Reasonable suspicion requires a particularized and objective basis that would lead one to suspect another of criminal activity." *Id.* (citing *State v. Woodruff,* 344 S.C. 537, 546, 544 S.E.2d 290, 295 (Ct.App. 2001)). "Reasonable suspicion 'is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act.' " *Id.* (quoting *United States v. Foreman,* 369 F.3d 776, 781 (4th Cir.2004)). "Therefore, courts must 'consider the totality of the circumstances' and 'give due weight to common sense judgments reached by officers in light of their experience and training.' " *Id.* at 500–01, 706 S.E.2d at 516 (quoting *United States v. Perkins,* 363 F.3d 317, 321 (4th Cir.2004)).

In *State v. Tindall,* 388 S.C. 518, 522, 698 S.E.2d 203, 205 (2010), an officer stopped Tindall for speeding, following too closely behind another vehicle, and failing to maintain his lane.

The officer eventually informed Tindall that he would receive a warning ticket, but the officer then continued questioning Tindall for six to seven additional minutes, asking about drug crimes and various things about Tindall's business. *Id.* The issue before the court was "whether the officer reasonably suspected a serious crime at the point at which he chose not to conclude the traffic stop, despite his stated intention to issue a warning ticket, instead opting to continue his questioning." *Id.* at 523, 698 S.E.2d at 206. The court found when the officer decided to continue detaining Tindall, he had ascertained the following facts:

(1) Tindall was driving to Durham to meet his brother; (2) Tindall was driving a rental car rented the previous day by a third-party which was to be returned to Atlanta on the day of the stop; (3) Tindall did a "felony stretch" on exiting the vehicle; and (4) Tindall seemed nervous.

*Id.* Our supreme court found those facts did not provide reasonable suspicion, and, thus, the continued detention was illegal. *Id.*

Moore concedes the initial stop was legal but contends Officer Owens exceeded the scope of the stop without reasonable suspicion of a serious crime. The question before this court is whether Officer Owens developed a reasonable, articulable suspicion that Moore was trafficking drugs at the time he intended to issue the warning citation such that the continued detention was lawful.

█ We first note the trial court placed a heavy emphasis on Moore's trip from Morganton to Lawrenceville to Marion in finding reasonable suspicion existed. The dissent believes the trial court's finding was consistent with Officer Owen's testimony, but we do not agree. Officer Owens simply stated the third-party rental agreement was indicative of drug trafficking and that it was an odd time of night to be visiting a grandmother especially given that Moore had been drinking. Officer Owens did not testify that the exact route Moore allegedly took was suspicious and gave no specific testimony to support the trial court's finding that it was doubtful he had driven from Morganton to Lawrenceville and back to Marion. It is important that we analyze the factors that Officer Owens considered at the time of the detention and not factors put

forth by the trial court at a later date. Thus, we do not address the trial court's finding as a factor in determining whether Officer Owens' continued detention of Moore was lawful.

The State argues there were many indicators giving rise to a reasonable suspicion: (1) Moore turned on his left turn signal when he was initially pulled over (sign that Moore might flee); (2) Moore took a long time to pull over (sign that Moore might flee); (3) Moore never turned off his turn signal (sign of nervousness); (4) Moore admitted to drinking (typically used to calm a drug trafficker's nerves); (5) Moore started smoking a cigarette (another sign of attempting to calm nerves); (6) Moore continued to talk on his cell phone after he was pulled over by officer (common in drug trafficking cases because it indicates he is attempting to let a superior know he has been stopped by law enforcement); (7) Moore's hands were shaking heavily and his pulse was elevated (additional signs of nervousness); (8) Moore tried to pick up his cell phone once he got out of the car (sign that Moore might flee); (9) Moore had a large amount of cash in his pocket even though he admitted to being unemployed; (10) Moore drove a rental car rented by a third-party (common in drug trafficking); (11) Moore was driving on I–85, coming from the Atlanta area (a known drug corridor and a major drug source); (12) Moore claimed to be on the way to visit his grandmother (unusual to visit grandmother at 1 a.m.); (13) Moore assumed the felony stretch position even though the officers did not ask him to do so; and (14) Moore remained extremely nervous even after he was advised he would only receive a warning citation.

We share the Fourth Circuit's concern regarding the State's inclination toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity. *See State v. Burgess*, 394 S.C. 407, 415, 714 S.E.2d 917, 921 (2011) (citing *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)).

[T]he State must do more than simply label a behavior as suspicious to make it so. The State must be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the

behavior is likely to be indicative of some more sinister activity than may appear at first glance.

*Id.* (internal quotations and citations omitted). We recognize that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion, but we do not believe the present factors eliminate a substantial portion of innocent travelers. *See United States v. Digiovanni,* 650 F.3d 498, 511–13 (4th Cir.2011). In our view the present factors have been expanded by the State in an effort to distinguish this case from *Provet.* Despite this effort, the alleged flight indicators lost much of their significance once Moore cooperated and stayed throughout the initial traffic stop and sobriety test. Further, the State attempted to expand the factor of nervousness into several factors by listing Moore's specific nervous conduct throughout the stop. As to Moore's wad of money, Officer Owens had no way of determining the total amount of cash in Moore's pocket, and it could have consisted of one dollar bills or one hundred dollar bills. Thus, this fact does not reasonably contribute to his reasonable suspicion. The State argues Moore's admission of drinking also contributed to Officer Owens' reasonable suspicion, but Officer Owens admitted Moore was not impaired and it would have been unfair to issue a ticket for an alcohol-related offense. Once we have viewed the factors in their totality, we find the State presented a similar case to *Tindall:* Moore was driving to visit a family member, Moore was driving a vehicle rented by a third-party, he was coming from a major city known as a drug hub and traveling along a known drug route, he assumed the felony position, and he displayed nervous conduct throughout the entire stop.

Consequently, we find these facts did not provide Officer Owen with a reasonable suspicion of a serious crime. Moore also declined consent to search his vehicle. As a result, the continued detention was illegal, and the drugs discovered during the search of the vehicle must be suppressed.

## CONCLUSION

For the foregoing reasons, the trial court is

**REVERSED.**

GEATHERS, J., concurs.

FEW, C.J., dissenting.

I would affirm the trial court's decision denying Moore's motion to suppress because there is evidence in the record to support the trial court's factual findings, and its legal conclusions are not clearly erroneous. *See State v. Tindall,* 388 S.C. 518, 523 n. 5, 698 S.E.2d 203, 206 n. 5 (2010) (summarizing our standard of review—"we must ask first, whether the record supports the trial court's assumed findings ... and second, whether these facts support a finding that the officer had reasonable suspicion of a serious crime"). As explained by the majority, trial courts employ a "totality of the circumstances analysis" and "must give due weight to common sense judgments reached by officers in light of their experience and training." *State v. Taylor,* 401 S.C. 104, 112–13, 736 S.E.2d 663, 667 (2013). In this case, the trial court did just that in concluding the officer's observations and the circumstances under which he assessed the situation gave rise to a reasonable suspicion that Moore was engaged in serious criminal activity.

The majority's opinion lists numerous observations the officer made that led him to be suspicious of Moore. I agree many of the facts the officer observed are insignificant, and I share the majority's frustration over the officer's attempt to make innocent circumstances appear suspicious. In this case, however, the trial court made specific factual findings regarding observations it found to be significant, focusing on two key facts—the "large sum of wadded money in [Moore's] pocket" and Moore's explanation that he was driving to his grandmother's house at 1:00 a.m. Our standard of review forbids us to disagree with these findings if there is any evidence to support them. *See* 401 S.C. at 108, 736 S.E.2d at 665 ("A trial court's Fourth Amendment suppression ruling must be affirmed if supported by any evidence.").

The majority's decision expressly disregards this standard of review as to these key facts. First, the majority improperly reassesses the significance the officer placed on the money found in Moore's pocket. During the suppression hearing, the officer testified,

I felt what I perceived as a large sum of wadded money in his pocket, and I left it there, and then Deputy or Corporal

Hancock proceeded in checking his pockets, then he pulled out the wad of money, and then put[ ] it back in his pocket.

When asked how much money he thought Moore had, the officer replied, "Well, it's more . . . folded money than I carry. I would . . . [say] it was at least . . . bordering a thousand dollars." The officer also testified that Moore told him he was unemployed. When asked about the apparently large amount of money in the possession of an unemployed suspect, the officer replied, "That would be cause for alarm."

The trial court found that "someone unemployed . . . [and] carrying such a large amount of cash in their pocket . . . would obviously give an officer reasonable suspicions." Despite the officer's testimony to support the trial court's finding, the majority disagrees. The majority states, "As to Moore's wad of money, [the officer] had no way of determining the total amount of cash in Moore's pocket, and it could have consisted of one dollar bills or one hundred dollar bills. Thus, this fact does not reasonably contribute to his reasonable suspicion."[2] In *State v. Wallace*, 392 S.C. 47, 52, 707 S.E.2d 451, 453 (Ct.App.2011), this court stated "the application of the law to a specific set of facts in an individual case can be unsettling." By that, we meant it can be difficult to determine "whether [the trial court's factual findings] support a [legal conclusion] that the officer had reasonable suspicion of a serious crime"— the second step in the analysis set out in *Tindall*. *See* 388 S.C. at 523 n. 5, 698 S.E.2d at 206 n. 5. In the first step of the *Tindall* analysis—reviewing the factual findings themselves— we are not permitted to make it difficult. Rather, we are constrained to determine whether there is any evidence to support the finding. In this instance, the majority simply disagrees with the trial court despite evidence supporting the trial court's finding. In doing so, the majority has failed to observe our standard of review.

---

2. I disagree with the majority's statement that this fact should not be considered because the officer "had no way of determining the total amount of cash in Moore's pocket." The officer made an on-the-spot assessment under the circumstances before him that Moore was carrying an unusual amount of money, and this made him suspicious. The trial court relied on this fact to find the officer's suspicion was reasonable. It makes no difference that the money could have been one dollar bills.

Second, the majority disregards our standard of review by minimizing the significance of the trial court's specific factual finding regarding Moore's pretextual explanation that he was driving to his grandmother's house at 1:00 a.m. along a highly improbable route. At the suppression hearing, the State offered in evidence the rental agreement the officer found in Moore's car, which showed the car had been rented in North Carolina the day before. Moore told the officer he had driven the car to a suburb of Atlanta, and was on his way back to Marion, North Carolina, to visit his grandmother. Based on this evidence, the trial court found:

> [T]he rental agreement indicates the rental in North Carolina on the evening, afternoon before the stop was made at one o'clock in the morning. I have my doubts that the car was driven from Morganton to Lawrenceville [Georgia] and back to Marion to visit a grandmother. That's a long way to go around to visit your grandmother. Morganton and Marion is a much shorter trip than that. So, it appears that he may [have] been less than truthful about the purpose of his trip.

The majority ignores this finding because it claims the officer "did not testify to this particular detail." However, as part of his testimony regarding observations he made during the traffic stop, which was offered to show why he was suspicious, the officer testified he read the rental agreement and found Moore's story regarding the purpose of his trip to North Carolina to be dubious, given the hour and his alleged destination. Because the officer's testimony and the evidence produced at the hearing supports the court's finding that Moore was "less than truthful about the purpose of his trip," we are not permitted to simply ignore this finding.

In addition to these two key facts, the trial court relied on other observations made by the officer that support the reasonableness of the officer's suspicion. In the argument portion of the suppression hearing, the assistant solicitor listed, by my count, eighteen separate facts in support of reasonable suspicion. While some of those facts are almost completely insignificant by themselves, I find the following facts, considered as a whole, to be important to our analysis: (1) Moore turned on his left turn signal, even though he was pulling over to the right side of the road, after the officer activated his blue

lights; (2) Moore took a long time to pull over; (3) the officer detected an odor of alcohol; (4) Moore smoked two cigarettes during the stop; (5) Moore continued talking on his cell phone during the stop; (6) the officer described Moore as "overly nervous;" (7) Moore's pulse was rapid; (8) Moore's breathing was heavy; (9) Moore tried to pick up his cell phone after he got out of the car; (10) someone other than Moore, who was not in the car, rented the car; (11) Moore was traveling from a city that is a known drug source; and (12) Moore looked down in a "defeated" fashion when asked if there were any illegal items in the car. The trial court clearly indicated it relied on these facts in addition to the two key facts discussed above, stating, "The other factors as noted, I have given those the weight required." While none of these twelve observations, on their own, could give rise to a reasonable suspicion of criminal activity, when considered together with the two key facts discussed above, they support the trial court's finding.

We must also consider the officer's background in law enforcement, which is extensive and includes: (1) being a member of the Highway Patrol with the South Carolina Department of Public Safety for seventeen years; (2) spending twelve of those years with the Aggressive Crime Enforcement Unit—nine of which he served as the first line supervisor for the unit; (3) receiving over a thousand hours in advanced criminal interdiction, which included drug interdiction; (4) being certified as a "master interdictor" through the National Criminal Enforcement Association; and (5) serving as an instructor for the South Carolina Criminal Justice Academy in criminal interdiction. *See Wallace,* 392 S.C. at 52, 707 S.E.2d at 453 (relying on *United States v. Branch,* 537 F.3d 328, 336, (4th Cir.2008), for the contention that courts should give weight to the practical experience of officers when determining the reasonableness of an officer's suspicion). In particular, I find the officer's experience in the Aggressive Crime Enforcement Unit and his training in drug interdiction important to support the reasonableness of his suspicion. *See id.* (considering the officer's education in drugs and drug interdiction in its analysis); *State v. Provet,* 391 S.C. 494, 506, 706 S.E.2d 513, 519 (Ct.App.2011) (considering, in particular, the officer's experience with the Aggressive Criminal Enforce-

ment Unit in determining the existence of reasonable suspicion).

Reviewing the record as a whole and considering the totality of the circumstances, the trial court did not err in concluding reasonable suspicion existed. Thus, I would affirm.