550 S.E.2d 294

The STATE, Respondent,

v.

Christopher RAMSEY, Appellant.

No. 25325.

Supreme Court of South Carolina.

July 23, 2001.

Heard May 8, 2001.

Decided July 23, 2001.

Rehearing Denied Aug. 22, 2001.

608

Assistant Appellant Defender Robert M. Dudek, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Jeffrey A. Jacobs, and Solicitor Warren B. Giese, all of Columbia, for respondent.

TOAL, Chief Justice:

Christopher Ramsey ("Ramsey") was found guilty of murder and kidnaping and was sentenced to life imprisonment. He appeals his sentence and conviction. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

William Mobley ("Mobley") was the night cashier at the Flamingo video games parlor in the Liberty Hill section of Kershaw County, South Carolina. On March 21, 1997, Richard Bowers ("Bowers"), a newspaper delivery person, discovered Mobley's dead body on Spring Rock Road as he was delivering the morning paper. Mobley had been brutally beaten and murdered. His throat was slashed from ear to ear with a serrated knife.

The Flamingo is a tavern and video poker establishment located about a mile from where Bowers found Mobley's body. Mobley was the sole employee of the Flamingo from midnight until 8:00 a.m., and the doors were locked between those hours. He would only allow people he knew into the club between those hours. Police investigators learned Mobley knew Ramsey, and probably would have let him in the Flamingo that night.

At the crime scene, police investigators found signs of a struggle and footprint impressions. The investigators also found a trail of blood stretching 244 feet from Mobley's body. They took plaster casts of footprints and tire impressions found at the scene.

There were several pieces of evidence linking Ramsey to the crime. First, police investigators found a striped sweater with blood on it near the crime scene.[1] One of the hairs from the sweater was determined to be Mobley's. Several witnesses identified Ramsey as wearing the striped sweater on the night of the murder. Tony Crolley testified he saw Ramsey driving in front of the Flamingo on the night of the murder wearing the striped sweater. He also stated he thought Ramsey wore a striped shirt or sweater with overalls most of the time. Truman Payne, who operated the Beaver Creek restaurant,

---

1. The sweater is a distinctive gray, brown, and beige horizontally striped sweater.

testified Ramsey had been in the restaurant wearing a striped sweater on the night of the murder. Melissa Payne, who was also working at the restaurant that night, corroborated her husband's testimony concerning the sweater, and testified there "is not no doubt in my mind" Ramsey was wearing a striped sweater.

Furthermore, investigators showed photographs of the sweater to other police officers. Several police officers saw someone wearing the sweater at the Kershaw County Courthouse prior to the murder. The investigators prepared a photographic lineup that included a picture of Ramsey. Two officers, Deputies Patrick Boone and David Dowey, both identified Ramsey from the lineup as the person wearing the sweater several days before at the courthouse. In fact, Deputy Boone knew Ramsey and had a conversation with him outside the courthouse when he was wearing the sweater.

The second piece of evidence linking Ramsey to the crime was a bloody boot found by police investigators at Ramsey's trailer. Although the pattern on the sole of the boots was similar to the cast taken from the crime scene, the boots were larger than the cast.[2] Blood from the boot as well as the blood from the sweater were sent to SLED for DNA testing. SLED agents determined the blood on the sweater matched the DNA profile of Mobley. The blood from the boot was forwarded to a lab in Tennessee for more testing.

Michael Deguglielmo ("Deguglielmo") from the Tennessee lab determined, through a polymerase chain reaction ("PCR") analysis, that the blood from the boot contained a mixture of DNA from two people. Deguglielmo testified the blood was not contaminated, it was simply a mixed sample. He further stated that mixed samples are a reality of life in forensic testing. Deguglielmo concluded he could not exclude Mobley as one of the persons whose blood was on the boot. Based on his testing, he determined the chance the DNA on the boot did not come from Mobley was one in 4,601—a percentage greater than 99.9.

---

2. Evidence was presented which indicated two people murdered Mobley. Ramsey was seen on the night of the murder with his roommate Joey "Clown" Connors.

The third piece of evidence linking Ramsey to the murder was the tire impressions taken from the crime scene. Police investigators photographed the tires on Ramsey's blue station wagon in order to compare them with the casts of the tire tracks from the crime scene. The impressions and the tires appeared to be similar. The tire tracks at the scene indicated the car was moving from the site where Mobley's body was discovered toward the site where the sweater was discovered. Ramsey was seen in the blue station wagon on the night of the murder.

Finally, when police officers arrested Ramsey, they advised him of his Miranda rights, and he waived them verbally and by signing a Miranda waiver form. As Captain Tomley was transporting Ramsey to the Sheriff's Department, Ramsey stated, "I guess you guys are going to be arresting Joey [Conners], because he was with me that night."

Ramsey was indicted by the Kershaw grand jury for the offenses of murder, kidnaping, and armed robbery. On November 10, 1998, the jury found Ramsey guilty of murder and kidnaping, but acquitted him on the armed robbery charge. The trial judge sentenced Ramsey to life imprisonment for murder but did not sentence him on the kidnaping charge pursuant to S.C.Code Ann. § 16–3–910 (Supp.2000). The following issues are before this Court on appeal:

I.    Did the trial judge err in refusing to conduct an *in camera* hearing regarding the suggestiveness of an out-of-court identification?

II.    Did the trial judge abuse his discretion by admitting expert testimony that the blood on the boot from Ramsey's trailer matched the blood of the victim?

III.    Did the trial judge properly deny Ramsey's motion for directed verdict?

## LAW/ANALYSIS

### I.  *In Camera* Hearing

Relying on *State v. Williams,* 258 S.C. 482, 189 S.E.2d 299 (1972), Ramsey argues the trial judge erred by refusing to hold an *in camera* hearing to challenge the suggestiveness of

the photographic lineup identification made by Deputies Boone and Dowey. We disagree.

■ Where identification is concerned, the general rule is that a trial court must hold an *in camera* hearing when the State offers a witness whose testimony identifies the defendant as the person who committed the crime, and the defendant challenges the in-court identification as being tainted by a previous, illegal identification or confrontation. *State v. Cash,* 257 S.C. 249, 185 S.E.2d 525 (1971). For example, in *State v. Simmons,* 308 S.C. 80, 417 S.E.2d 92 (1992), this Court remanded the case for an *in camera* hearing where a witness saw a suspect at a bond hearing prior to his in-court identification of the suspect. The witness may have gotten a "fix" on the suspect at the bond hearing because the suspect's name was called and she came forward for the judge to set bond. *Id.* An *in camera* hearing was needed to determine whether the in-court identification was of independent origin or was the tainted product of the circumstances surrounding the bond hearing. *Id.* The cases cited by Ramsey involve situations where an in-court identification is the product of an unlawful confrontation or lineup. These cases, however, are immaterial because the issue in this case is simply whether an out-of-court photographic lineup was impermissibly suggestive, not whether the subsequent in-court identification was tainted.

■ Defense counsel did not object to the manner in which the photographs in the lineup were presented to the officers. Ramsey's main concern is that after the sweater was discovered, and the police department identified him as a suspect, investigators asked the two officers whether they had seen anyone in the lineup wearing the striped sweater. Deputy Boone was able to identify Ramsey with no problem. Deputy Dowey, however, recognized the sweater, but could not remember who he saw wearing it. He remembered Ramsey wore the sweater at the police station only after he saw the lineup. Defense counsel maintains the two officers would naturally "pick the big suspect in the big case for the Sheriff's Department at that time."

Even if the photographic lineup was impermissibly suggestive, any error in the trial court's refusal to conduct an *in*

*camera* hearing was harmless. *See Simmons, supra* (noting that under certain circumstances, if the identification is corroborated by either circumstantial or direct evidence, the harmless error rule is applicable). Even without the deputies' testimony, the State had the testimony of three witnesses who testified they had "no doubt" Ramsey was wearing a striped sweater on the day of the murder. Ramsey did not challenge this testimony, which is actually more probative than the deputies' testimony. Therefore, even if the admission of the deputies' testimony was erroneous, it was harmless error.

## II. DNA Evidence

Ramsey argues the trial judge erred by admitting the "contaminated" DNA evidence from his boot. Ramsey also contends the DNA evidence was unreliable pursuant to Rule 702, SCRE. We disagree. This issue contains the following two distinct subparts: (1) whether the evidence was tainted and totally unreliable pursuant to *State v. Ford*, 301 S.C. 485, 392 S.E.2d 781 (1990); and (2) whether Mr. Deguglielmo's expert testimony was based on unreliable scientific evidence which should be excluded pursuant to Rule 702, SCRE.

### A. Tainted Evidence

According to Ramsey, the police investigators mishandled all of the evidence in this case and committed "classic violations of evidence preservation." Specifically, pieces of evidence were taken from one crime scene to another. For example, the blood evidence was taken from the murder scene, to the Flamingo, and finally to Ramsey's home. The police investigators also took the striped sweater from the murder scene to the Flamingo where they removed hairs. Finally, the bloody footprint casts were taken from the murder scene to Ramsey's home where they were washed. According to Ramsey's expert witness, Donald Girndt ("Girndt"), a former SLED agent and crime scene investigator, the blood on the boot could have been contaminated because the victim's blood from the casts may have splashed onto the boot while they were being washed. Girndt maintained the evidentiary value of the blood on the boot under these circumstances was virtually zero.

DNA evidence may be admitted in judicial proceedings in this State in the same manner as other scientific

evidence, such as fingerprint analysis and blood tests. *Ford, supra.* However, the admissibility of DNA evidence remains subject to traditional attack, such as attacks based on relevancy or prejudice. *Id.* According to this Court in *Ford,* "traditional challenges to the admissibility of [DNA] evidence such as the contamination of the sample or chain of custody questions may be presented. These issues relate to the weight of the evidence. The evidence may be found to be so tainted that it is totally unreliable and, therefore, must be excluded." *Id.* at 490, 392 S.E.2d at 784.

■ We find the DNA evidence in this case is not so tainted that it is totally unreliable. Two conflicting theories were offered at trial as to how the evidence was collected and its potential for contamination. Ramsey maintains the blood on the boot could be contaminated, while the police officers testified they were careful and complied with procedures. We find these issues relate to the weight of the evidence.

B.   Admissibility Pursuant to Rule 702, SCRE

■ The proper standard for the admissibility of scientific evidence is outlined in Rule 702, SCRE. Pursuant to Rule 702, SCRE, in order for the evidence to be admissible, the trial judge must find the scientific evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable.[3] The trial judge should determine the reliability of the underlying science by using the following factors: (1) the publication of peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures. *State v. Council,* 335 S.C. 1, 515 S.E.2d 508 (1999). Further, even if the evidence is admissible under Rule 702, SCRE, the trial judge must determine if its probative value is outweighed by its prejudicial effect under Rule 403, SCRE. Once the evidence is

---

3.  Rule 702, SCRE, states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

admitted under these standards, the jury may give it such weight as it deems appropriate. *Id.*

Ramsey does not challenge the evidence based on any of the *Council* factors. Most importantly, he does not challenge the qualifications of the State's expert, Deguglielmo, or the reliability of the PCR procedure. He challenges only the means in which the police officers handled the evidence prior to the testing conducted by Deguglielmo.

The issue is whether Deguglielmo's expert testimony regarding the DNA evidence was unreliable pursuant to Rule 702, SCRE and, therefore, inadmissible. This Court reviews the admission of such testimony under an abuse of discretion standard. *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998).

The trial judge did not abuse his discretion by admitting Deguglielmo's expert testimony. First, Ramsey does not challenge the PCR procedure used by Deguglielmo to test the DNA samples. Even if the samples were mixed during collection, Ramsey does not demonstrate Deguglielmo's testing procedure was unreliable, much less so unreliable as to warrant exclusion. Second, the testimony concerning the DNA evidence complied with the requirements as set forth in *Council*. Any evidence concerning contamination, therefore, went to the weight of the testimony, not its admissibility. Finally, the mixture of DNA evidence is not a basis for the exclusion of PCR evidence. *See Oregon v. Lyons*, 124 Or.App. 598, 863 P.2d 1303 (1993) (finding the potential for DNA contamination presents an "open field" for cross examination at trial, but does not indicate the PCR method of DNA testing is inappropriate for forensic use). According to Deguglielmo, mixed samples are simply a fact of life in forensic science.

### III. Directed Verdict

Ramsey argues the trial judge should have directed a verdict of acquittal because the DNA evidence should have been excluded.[4] Because we find the DNA evidence was

---

4. A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. Brown*, 103 S.C. 437, 88 S.E. 21(1916). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused,

admissible, it is unnecessary for us to address Ramsey's directed verdict motion.

## CONCLUSION

Based on the foregoing, Ramsey's sentence and convictions are **AFFIRMED.**

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.

the Court must find the case was properly submitted to the jury. *State v. Pinckney,* 339 S.C. 346, 529 S.E.2d 526 (2000).