# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Nathaniel David Rowland, Appellant.

Appellate Case No. 2021-000822

―――――――――――

Appeal From Richland County
Clifton Newman, Circuit Court Judge

―――――――――――

Opinion No. 6084
Heard May 7, 2024 – Filed August 21, 2024

―――――――――――

**AFFIRMED**

―――――――――――

Appellate Defender Lara Mary Caudy, of Columbia, for
Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, Senior
Assistant Attorney General W. Edgar Salter, III, and
Solicitor Byron E. Gipson, all of Columbia, for
Respondent.

**THOMAS, J.:**  Nathaniel D. Rowland (Appellant) appeals his convictions and
sentences for murder, kidnapping, and possession of a weapon during the
commission of a violent crime.  Appellant argues the trial court erred by: (1)
denying Appellant's motion to suppress evidence obtained as a product of the
traffic stop because law enforcement did not have probable cause that a traffic
violation had occurred or reasonable suspicion that the occupants of the car were

engaged in criminal activity; (2) admitting expert testimony from the State's document examiner that it was "probable" the person who wrote the inscription on the back of an envelope found in Appellant's car was the same person whose handwriting appears on Appellant's personnel records obtained from previous employers; and (3) admitting testimony from the State's expert DNA analyst concerning Appellant's inclusion in a mixture of DNA found on a multi-tool, cuttings from a roll of paper towels, and a sample from a pair of pants. We affirm.

## I.     FACTS

On Thursday, March 28, 2019, Samantha Josephson, a senior at the University of South Carolina, went out with a group of friends to the Five Points neighborhood in Columbia. The group ended up at the Bird Dog bar on Harden Street. Josephson kept in contact with her boyfriend in Mount Pleasant, Greg Corbishley, throughout the evening via phone calls, text messages, and FaceTime conversations. At approximately 2:04 a.m., Josephson called Corbishley to inform him that she ordered an Uber to take her home to her apartment at the Hub on Main Street. The couple ended the phone call, but Corbishley continued to track Josephson's location via the Find My Friends feature on iPhones. Corbishley testified it was normal for him to monitor Josephson's location on nights out to ensure she made it home safely. While he was tracking her location, Corbishley noticed Josephson's path of travel was going south of the Five Points neighborhood, the opposite direction in which a person would travel to go from the Bird Dog bar to the Hub apartments. Corbishley called, texted, and Snapchatted Josephson several times with no response. At around 2:30 a.m., Corbishley noticed Josephson's location had been turned off, and her last pinned location was at Montgomery Avenue and South Ott Road in the Rosewood area.[1] Corbishley testified that, because Josephson never turned off her location during their relationship, he initially surmised she had accidentally dropped her phone in the Uber on the ride home. He exchanged text messages with Josephson's roommates at around 3:30 a.m. explaining the situation but ultimately fell asleep at 5:00 a.m.

When he woke up at around 11:00 a.m. on March 29, Corbishley saw messages from Josephson's roommates that she never returned home, she did not show up for her morning shift at Liberty Tap Room in the Vista, and her roommates had notified the police. The officer who responded to the Hub to meet with Josephson's roommates gathered information to file a missing person report and

---

[1] It was later discovered that Josephson's last known location was in the vicinity of Appellant's sister's home at Hemphill Road in Rosewood.

issue a be on the lookout (BOLO) to the police department and the public. At 5:37 p.m., all Columbia Police Department employees received an email from Investigator Chris Odom requesting assistance in locating Josephson. A missing person awareness bulletin attached to the email included a photograph of Josephson, her information, and the following details about her disappearance:

> The Columbia Police Department's Special Victim's Unit is seeking information leading to the location of the above missing individual. Josephson was last seen outside of Bird Dog in Five Point[s] around 0200 this morning. Prior to the phone going dead the phone was being tracked by her boyfriend. The last location was in the Rosewood Area. Josephson was last seen wearing an orange top and black jeans. Josephson did not show up for work this morning.

Law enforcement, friends, and family began to search for Josephson. They initially searched at her last known location in Rosewood but found nothing. The group then visited the Bird Dog bar in Five Points where Josephson was last seen by her friends, and where she told Corbishley she was as she left to return home the previous night. The Bird Dog staff provided them with video surveillance from outside the bar where they saw Josephson get into a black Chevrolet Impala. At 7:10 p.m., all Columbia Police Department employees received an updated BOLO for Josephson that read, "There is video of the victim getting into a black Chevy Impala (newer model)" and included a still shot of the vehicle.

Officer Jeffrey Kraft with the City of Columbia Police Department began his shift at 6:00 p.m. on Friday, March 29. At the time his shift began, Ofc. Kraft was aware of Josephson's status as a missing person and the circumstances surrounding her disappearance based on the two BOLO emails the police department employees received. On that night, as part of his regular duty, Ofc. Kraft was patrolling the Five Points and Rosewood areas. While on patrol, at approximately 2:33 a.m. on Saturday, March 30, Ofc. Kraft noticed a newer model black Chevrolet Impala that matched the vehicle in the BOLO travelling north on Harden Street heading into the Five Points district. Ofc. Kraft got behind the vehicle as it turned left at the intersection of Harden and Blossom Streets, approximately two blocks from where Josephson was last seen twenty-four hours prior at the Bird Dog. As the Impala turned onto Blossom Street, Ofc. Kraft activated his blue lights to initiate a traffic stop. The Impala continued to travel on Blossom Street

before improperly turning left onto Saluda Avenue and coming to a stop facing the wrong way on the one-way road.

Ofc. Kraft approached the vehicle on the driver's side and spoke to the driver, who was later identified as Appellant. Ofc. Kraft identified himself and asked Appellant for his driver's license, which Appellant admitted he did not have. Ofc. Kraft then smelled marijuana emanating from the vehicle. When asked who was smoking, Appellant admitted he had been smoking earlier. Ofc. Kraft ordered Appellant out of the car and informed him he was stopped because his vehicle matched the description of a suspect vehicle. Before Ofc. Kraft could finish his statement, Appellant "took off running." He was ordered to stop but did not comply. Ofc. Kraft initially began pursuit of Appellant, but soon returned to the vehicle while other officers apprehended him because there was another individual in the vehicle at the time of the traffic stop. The woman in the passenger seat was identified as Vaniesha Wilson, a friend of Appellant who stated they were coming from Appellant's sister's house on Hemphill Road in Rosewood. Ofc. Kraft began a preliminary search of the vehicle where he discovered marijuana "shake" throughout the vehicle, as well as a rose gold iPhone and a set of keys with a pink key ring labeled "room". Ofc. Kraft and additional officers began to notice what looked to be blood stains, footprints on the interior back windows, and cleaning supplies scattered throughout the vehicle. While Ofc. Kraft was securing the vehicle during Appellant's apprehension, he was informed by another officer that Josephson's body had been discovered at approximately 2:00 p.m. on Friday, March 29, by turkey hunters in a remote, wooded area in Clarendon County.[2] Thus, officers terminated their preliminary search and waited for crime scene technicians to arrive to properly process the vehicle and its contents.[3]

---

[2] Josephson's body was recovered in a wooded area off of a "farmer's access road" in New Zion. The hunters who found her body testified that the area was not one of high traffic, and there is "no reason [a person] would just end up there." The area where she was found was later determined to be approximately one mile "straight through the woods" to Appellant's parents' home.

[3] Crime scene investigators recovered an overwhelming amount of evidence against Appellant. A brief overview of some of this evidence includes: (1) forensic analysis/cell site location information of GPS coordinates of Appellant, Appellant's girlfriend, and Josephson; (2) video surveillance from various locations in the city of Columbia; (3) trace evidence, including various prints, in Appellant's vehicle; and (4) DNA mixtures on various items in Appellant's car and other locations.

Appellant was indicted for murder, kidnapping, and possession of a weapon during the commission of a violent crime. He was convicted as charged and received life without parole for murder and five years for the weapons offense, to be served concurrently.[4]

## II.  STANDARD OF REVIEW

"Appellate courts routinely reviewed cold records and depended on trial courts to review credibility and weigh conflicting evidence in reaching [their decisions]. However, with the dawn of the technological age, appellate courts are no longer dependent on the trial court in our review of evidence." *State v. Frasier*, 437 S.C. 625, 632, 879 S.E.2d 762, 766 (2022), *reh'g denied* (Nov. 17, 2022). "[W]hile the need for deference remains, particularly in determining issues of credibility, it is no longer necessary for us to defer to the trial court's overall ruling in every case." *Id.* "Instead, we take this opportunity to refine our standard of review to better align with the federal standard, which has been adopted in nearly every state. Accordingly, appellate review of a motion to suppress based on the Fourth Amendment involves a two-step analysis." *Id.* at 632-33, 879 S.E.2d at 766. "This dual inquiry means we review the trial court's factual findings for any evidentiary support, but the ultimate legal conclusion—in this case whether reasonable suspicion exists—is a question of law subject to de novo review." *Id.*

A trial court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion. *State v. White*, 382 S.C. 265, 269, 676 S.E.2d 684, 686 (2009) (citing *State v. Price*, 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006)). The trial court abuses its discretion when "the ruling is unsupported by the evidence or controlled by an error of law." *State v. Roy Lee Jones*, 423 S.C. 631, 636, 817 S.E.2d 268, 270 (2018) (citing *Maybank v. BB&T Corp.*, 416 S.C. 541, 567, 787 S.E.2d 498, 511 (2016)). The appellant must satisfy the appellate court that "there has been prejudicial error." *State v. Smith*, 230 S.C. 164, 168, 94 S.E.2d 886, 887 (1956) (citations omitted).

---

[4] No sentence was imposed for the kidnapping charge. *See* S.C. Code Ann. § 16-3-910 (2015) ("Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, except when a minor is seized or taken by his parent, is guilty of a felony and, upon conviction, must be imprisoned for a period not to exceed thirty years *unless sentenced for murder* as provided in Section 16-3-20." (emphasis added)).

## III.   LAW/ANALYSIS

### A.   Evidence Obtained at Traffic Stop

Appellant argues the trial court erred by denying his motion to suppress evidence obtained as a product of the traffic stop because law enforcement did not have probable cause that a traffic violation had occurred or reasonable suspicion that the occupants of the car were engaged in criminal activity.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The stopping of a vehicle and the detention of its occupants constitute a seizure and implicate the Fourth Amendment's prohibition against unreasonable searches and seizures.  *State v. Butler*, 353 S.C. 383, 389, 577 S.E.2d 498, 501 (Ct. App. 2003) (citing *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

Our courts have held that in South Carolina, an officer may stop and briefly detain the occupants of a car without treading on Fourth Amendment rights, even without probable cause to arrest, if he has a reasonable suspicion that the occupants are involved in criminal activity.  *Id*. (citing *State v. Woodruff*, 344 S.C. 537, 546, 544 S.E.2d 290, 295 (Ct. App. 2001)).  "[A] policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke that suspicion." *State v. Nelson*, 336 S.C. 186, 192, 519 S.E.2d 786, 789 (1999) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).  "The term 'reasonable suspicion' requires a particularized and objective basis that would lead one to suspect another of criminal activity." *Woodruff*, 344 S.C. at 546, 544 S.E.2d at 295 (citations omitted).  In analyzing reasonable suspicion, "it is entirely appropriate for courts to credit the practical experience of officers who observe on a daily basis what transpires on the street." *State v. Wallace*, 392 S.C. 47, 52, 707 S.E.2d 451, 453 (Ct. App. 2011) (citing *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008)).  "In determining whether reasonable suspicion exists, the whole picture must be considered." *Woodruff*, 344 S.C. at 546, 544 S.E.2d at 295 (citations omitted).   "Factors that are alone consistent with 'innocent travel' can, when 'taken together' produce a reasonable suspicion of criminal activity." *Wallace*, 392 S.C. at 52, 707 S.E.2d at 453 (quoting *United States v. Sokolow*, 490 U.S. 1, 9 (1989)).  "In applying the concept of reasonable suspicion to the various facts of a case, '[i]t

is the entire mosaic that counts, not single tiles.'" *Id*. (quoting *United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir. 1988)).

The case at hand is similar to our supreme court's case, *Robinson v. State*.[5] In *Robinson*, a BOLO was released to law enforcement after an armed robbery in which four African-American males fled the scene either on foot or in a vehicle, which the BOLO did not specify. *Robinson*, 407 S.C. at 177, 754 S.E.2d at 866. An officer noticed a parked vehicle in an unlit church parking lot, effected a seizure, and was able to identify the men as the perpetrators.[6] *Id.* A subsequent search of the vehicle revealed an altered gun on the floorboard. *Id*. at 184, 754 S.E.2d at 870. The court found the police officer who effected the seizure of the parked vehicle's occupants had a reasonable suspicion that potential criminal activity was afoot, such that the seizure was justified. *Id*. at 185, 754 S.E.2d at 870. The court found removing the men from the vehicle and frisking them for weapons was reasonable because the men matched the approximate BOLO description and they were in close proximity to the bar where the robbery occurred no more than 20 minutes before the arrival of the officer; and when two backup officers arrived, the men's sudden nervousness and other aspects of their demeanor further aroused officers' suspicions. *Id*.

Appellant argues that because the circumstances of the case at hand did not rise to the level of suspected criminal activity, the stop constituted an improper seizure. Appellant argues there was no "reasonable suspicion," as the term was defined in *Robinson*, since there was no information that any crime had occurred or that Appellant was engaged in criminal activity when Ofc. Kraft initiated the stop. Rather, the only information he had was that the victim was last seen in Five Points getting into a newer model black Impala, which is a common car, and that no one had heard from her in twenty-four hours. Appellant claims if the stop of his vehicle was legal, then law enforcement would have constitutionally been permitted to stop any black Chevy Impala in the Five Points and Rosewood areas in the hours and days after Josephson's disappearance.

---

[5] 407 S.C. 169, 754 S.E.2d 862 (2014).
[6] The officer knew that there was a parked car in a closed and darkened church parking lot on a Tuesday night, the car was behind a fence with its lights off, there was no reason for the car to be behind the fence at that time of night when the church was closed, and the area where the car was parked was not readily open to the public. *Robinson*, 407 S.C. at 177-78, 754 S.E.2d at 866.

Here, Ofc. Kraft testified his patrol shift began at 6:00 p.m. on Friday, March 29, 2019, the same day Josephson's roommates reported her missing to the Columbia Police Department. At the time his shift started, Ofc. Kraft had already received the initial BOLO regarding Josephson's disappearance. A little over an hour and a half into his shift, Ofc. Kraft received the second BOLO alert from the department with a still shot of the Black Chevy Impala Josephson was last seen getting into. At trial, the State argued that at the time Ofc. Kraft initiated the traffic stop,

> All he knows is that a young girl has gone missing, has been missing for some twenty-four hours. That there is video of her getting in—the last video, the last known contact with her is of her getting in what appears to be a black Chevy Impala. That there has been no contact with her. No one has seen or heard from her since that time. And additionally[,] that the location . . . where she was last seen getting into the black Impala, was approximately one block from where he sees this Impala.

We find Ofc. Kraft was acting diligently in the course of a missing person investigation and he had reasonable suspicion for the stop. We find support from our supreme court's analysis in *Frasier*:

> Although reasonable suspicion is not susceptible to a rigid, formulaic approach, it requires more than a mere hunch or unparticularized suspicion. [*Robinson*, 407 S.C.] at 182, 754 S.E.2d at 868. In other words, for an officer to have reasonable suspicion, "there [must] be an objective, specific basis for suspecting the person stopped of criminal activity." *Id.* While reasonable suspicion is not a high bar and "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). This inquiry involves the totality of the circumstances, and "[c]ourts must give due weight to common sense judgments reached by officers in light of their experience and training." *State v. Moore*, 415 S.C. 245, 252-53, 781 S.E.2d 897, 901 (2016).

437 S.C. at 635, 879 S.E.2d at 767 (second alteration in original).

We further find Appellant failed to establish a Fourth Amendment violation because Ofc. Kraft's initial investigatory stop was justified by the exigent circumstance of attempting to find a missing person. Because Josephson's whereabouts were unknown at the time of the stop, the circumstances would lead an officer to believe she could be in danger. The State notes "a number of courts relied on a 'community caretaking' exception to uphold warrantless searches and/or seizures, including the search for missing persons, for decades after *Cady* [*v. Dombrowski,* 413 U.S. 433 (1973)], until the Court's 2021 decision in *Caniglia v. Strom*, [593 U.S. 194] (2021)." In *Caniglia*, the Supreme Court vacated and remanded the lower court's finding that the removal of Caniglia and his firearms from his home was justified by a community caretaking exception to the warrant requirement. However, the search and seizure at issue in *Caniglia* took place in the home, not a vehicle. We find support in the concurrences of *Caniglia*, which make clear that many of the searches and seizures conducted for non-law enforcement purposes are still constitutional if they fall within an exigent circumstance. "The responsibility of police officers to search for missing persons . . . and to aid the ill or injured has never been the subject of serious debate; nor has the responsibility of police to provide services in an emergency." *Caniglia*, 593 U.S. at 206 (Kavanaugh, J., concurring). We note a line of caselaw that allows for the type of community caretaking exigency *Caniglia* renounced: "'Exigencies' exist when an officer would reasonably suspect that the conditions create a need to act 'now or never' to protect an important public interest—like a threat to public safety." *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *see Mincey v. Arizona*, 437 U.S. 385, 392, (1978) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.").

Ofc. Kraft was acting diligently in the course of a missing person investigation, and the facts and circumstances he knew about Josephson's disappearance at the time he spotted the Impala two blocks from the location where Josephson was last seen surpassed the threshold of a "mere hunch or unparticularized suspicion." Further, after Ofc. Kraft's blue lights were activated, Appellant turned the wrong way down a one-way road. This fact coupled with Appellant's lack of identification, the apparent odor of marijuana emanating from the car, and Appellant's flight on foot permitted further detention by law enforcement pursuant

to *Robinson*.  *See Robinson*, 407 S.C. at 182, 754 S.E.2d at 869 ("If, during the stop of the vehicle, the officer's suspicions are confirmed or further aroused—even if for a different reason than he initiated the stop—the stop may be prolonged, and the scope of the detention enlarged as circumstances require.").  By applying both *Robinson* and *Frasier*, we find law enforcement satisfied the threshold requirement of reasonable suspicion; thus, the trial court did not err when it denied Appellant's motion to suppress evidence obtained as a product of Ofc. Kraft's traffic stop.

## B.      Expert Testimony: Handwriting and DNA

Appellant argues the trial court erred by admitting expert testimony from the State's document examiner that it was "probable" the person who wrote the inscription on the back of an envelope found in Appellant's car was the same person whose handwriting appears on Appellant's personnel records obtained from previous employers.  Specifically, Appellant argues the evidence was inadmissible under Rule 702 of the South Carolina Rules of Evidence (SCRE), given that it could not assist the jury in understanding the evidence or determining a fact at issue.  He further argues the evidence was not relevant pursuant to Rule 401, SCRE, and any probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under Rule 403, SCRE.  Appellant makes the same Rule 702 and Rule 403 arguments as to testimony from the State's expert DNA analyst concerning Appellant's inclusion in a mixture of DNA found on a multi-tool knife, cuttings from a roll of paper towels, and a sample from a pair of pants.

"As a threshold matter, the trial judge must initially determine whether the proffered evidence is relevant as required under Rule 401 of the South Carolina Rules of Evidence."  *State v. Clasby*, 385 S.C. 148, 154, 682 S.E.2d 892, 895 (2009).  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401, SCRE.  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Rule 403, SCRE.  "Unfair prejudice means an undue tendency to suggest [a] decision on an improper basis." *State v. Gilchrist*, 329 S.C. 621, 627, 496 S.E.2d 424, 427 (Ct. App. 1998) (citing *State v. Alexander*, 303 S.C. 377, 401 S.E.2d 146 (1991)).  "A [circuit court]'s decision regarding the comparative probative value and prejudicial effect of

relevant evidence should be reversed only in exceptional circumstances." *State v. Sweat*, 362 S.C. 117, 129, 606 S.E.2d 508, 514 (Ct. App. 2004).

Before admitting expert testimony, trial courts, as the gatekeepers of evidence, must ensure the proffered evidence is beyond the ordinary knowledge of the jury; the witness has the skill, training, education, and experience required of an expert in his field; and the testimony is reliable. *State v. Moorer*, 439 S.C. 525, 544, 888 S.E.2d 725, 734 (Ct. App. 2023) (citing *Watson v. Ford Motor Co.*, 389 S.C. 434, 445-46, 699 S.E.2d 169, 174-75 (2010)); Rule 702, SCRE.  In South Carolina, a trial court minding the Rule 702 gate must assess not only (1) whether the expert's method is reliable (i.e., valid), but also (2) whether the substance of the expert's testimony is reliable.  *Id.*; *see State v. Council*, 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999) (concluding the trial court must determine whether underlying science is reliable); *Watson*, 389 S.C. at 446, 699 S.E.2d at 175 ("[T]he trial court must evaluate the substance of the testimony and determine whether it is reliable.").

## 1.      Handwriting Comparison Testimony

While searching the vehicle, crime scene investigators recovered an envelope with presumed blood on the corner and a handwritten list on the back.  A fingerprint on the envelope was later determined to be that of Appellant.  Josephson's DNA was also found on the envelope.  Trial testimony revealed the contents of the list:

> We have a number 4 and we have a circled out or overwritten portion under the number 4.  We have job, j-o-b.  Beside it is another overwritten portion and then there's a colon, 30, 3-0, 4 PM.  Next line is duct tape, tape whole body.  Next line is gloves.  Next line is all black.  Next line is flip phone.  Next line is gasoline.  Next line is matches and then there's a crossed out line below the matches line.

Pretrial, Appellant moved to exclude SLED documents examiner John Jamieson's testimony about handwriting comparisons he made between the handwriting on the back of the envelope seized from Appellant's car with two known personnel documents from Appellant's previous employers, Capital Waste Services and FedEx.  Initially, the trial court found it would be premature to rule on admissibility because it had not yet heard testimony about how the documents were acquired.  Ultimately, the court allowed the testimony.  Based on his comparison of the known documents with the handwriting on the envelope found

in Rowland's car, Jamieson concluded, "My determination was that it's probable that the writer of the known documents wrote—also wrote the questioned document. Probable means a high degree of likelihood that they were written all by the same writer, both questioned and known."

As a threshold matter, we find the trial court did not err because the testimony of the State's documents examiner, Agent Jamieson, was relevant. First, the envelope was found in Appellant's car, which law enforcement had already determined to be a crucial part of the crime scene. Next, the envelope contained presumed blood—later determined to be Josephson's—as well as Appellant's fingerprint. The crux of Agent Jamieson's testimony was that it was probable that the same individual who filled out Appellant's employment documents also authored the list on the envelope found in Appellant's car.

Next, we find Agent Jamieson's testimony was admissible as expert testimony pursuant to Rule 702, SCRE, because it assisted the jury in determining who wrote the bloody note found in Appellant's car. Appellant did not object to Agent Jamieson's qualification as an expert either pretrial or at trial, and he has never asserted that handwriting analysis is not beyond the common knowledge of the jury. *See Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 153, 747 S.E.2d 468, 481 (2013) ("[W]here a subject is beyond the common knowledge of the jury, expert testimony is required."). Nor does he presently contend that Agent Jamieson's testimony did not satisfy the factors for the admission of expert testimony under Rule 702, SCRE, except for reliability. Rather, he claims that the challenged evidence was not reliable because Agent Jamieson found that it was "probable" that Appellant wrote the list on the envelope. At trial, outside the presence of the jury, defense counsel argued, "The expert is supposed to testify in an area to a material fact, and they are supposed to assist the jury in understanding a material fact . . . . Saying something is probable is offering an assumption."

We find the trial court did not abuse its discretion when it denied Appellant's motion to suppress because a trial judge is not required to decide if the expert's testimony is "correct." This court has recently held:

> As long as the trial court is satisfied the expert's testimony consists of a reliable method faithfully and reliably applied, the gate of admissibility should be opened. The correctness of the conclusion reached by an expert's faithful application of a reliable method (and the credibility of the expert who reached it) is for the jury,

> for the trial judge must remain at the gatepost and not
> tread on the advocate's or the jury's turf.

*Moorer*, 439 S.C. at 545, 888 S.E.2d at 735. *See Jones*, 423 S.C. at 639-40, 817 S.E.2d at 272 ("There is always a possibility that an expert witness's opinions are incorrect. However, whether to accept the expert's opinions or not is a matter for the jury to decide. Trial courts are tasked only with determining whether the basis for the expert's opinion is sufficiently reliable such that it be may offered into evidence.").

Here, the handwriting comparison testimony was not solely offered to identify Appellant as the perpetrator of the crime; rather, the genuine handwriting from his personnel records compared to the list on the envelope showed Appellant was the probable author of the bloody note containing Josephson's DNA.

Finally, we find the probative value of Agent Jamieson's testimony outweighed the dangers of undue prejudice; therefore, the trial court did not abuse its discretion in admitting the evidence. Because there were no eyewitnesses to the kidnapping and murder, circumstantial evidence such as the evidence Agent Jamieson presented was crucial for the jury, albeit not conclusive. We conclude the trial court did not abuse its discretion and properly admitted the testimony of Agent Jamieson under Rules 401, 403, and 702, SCRE.

## 2.    DNA Analysis Testimony

Appellant argues Agent Ryan DeWane's testimony only provided "weak support" for Appellant's DNA inclusion on the three challenged items of evidence; therefore, her testimony as to the DNA found on these items should not have been admitted.

As part of the investigation into the kidnapping and murder of Josephson, law enforcement searched the home of Appellant's girlfriend, Maria Howard. Several relevant items of evidence were collected from trash cans behind Howard's apartment, including the three items at issue. At trial, SLED DNA analyst Agent DeWane testified that Appellant's DNA was present on samples collected from the above-referenced evidence.

Pretrial, the circuit court conducted an in-camera hearing to consider the admissibility of the State's proposed expert testimony regarding the DNA gathered and analyzed during the investigation. The State elicited Agent DeWane's

testimony as to her methodology, and she generally explained the steps of her DNA analysis, what is meant by a "mixture," SLED's use of "a statistical software profile called STRmix to do [its] comparisons," and how this software enables SLED to include or exclude someone from a mixture of unknown individuals. She also explained "if we have any possible inclusions, then we report that conclusion with a statistic." Importantly, Agent DeWane explained:

> We have a verbal scale at the end of our reports. This shows our level of support based on the number that's generated . . . We have multiple levels of support. Our lowest level is weak support. We then have … moderate support, strong support, and then very strong support . . . The larger the number is, the more support will be associated with it. Our strongest level of support starts at 1 million and above.

Agent DeWane stated she developed a DNA profile from the cutting of the wad of paper towels, and this profile indicated a mixture originating from three individuals. She opined that the DNA profile was "approximately 2.7 septillion times more likely if [Josephson] … and two unidentified, unrelated individuals contributed to the mixture than if three unidentified, unrelated individuals contributed to the mixture. Agent DeWane explained that "[t]he statistic supports inclusion for both" Josephson and Appellant. With respect to the verbal scale, "the statistic associated with [Josephson] … falls within our very strong support range; [and] the statistic associated with … [Appellant] … falls within our weak range."

Agent DeWane next developed a DNA profile from a cutting from the left thigh of Appellants' pants that was a mixture of three individuals. She opined that "the DNA profile is approximately 3.1 septillion times more likely if [Josephson] … and two unidentified, unrelated individuals contributed to the mixture than if three unidentified, unrelated individuals contributed to the mixture."

Agent DeWane then developed a DNA profile from the swab of the inner edges of the handles of the multi-tool knife; it contained a mixture originating from three individuals. The result was "the DNA profiled is approximately 2.6 septillion times more likely if [Josephson] … and two unidentified, unrelated individuals contributed to the mixture than if three unidentified, unrelated individuals contributed to the mixture." There was very strong support for Josephson's inclusion. "Under the same scenarios, the DNA profile is approximately 49 times more likely if … [Appellant] and two unidentified, unrelated individuals

contributed to the mixture than if three unidentified, unrelated individuals contributed to the mixture." This was only in the "weak level of support." Agent DeWane developed a Y-STR profile from the swab of the multi-tool's handle that contained a mixture of at least two male individuals. She excluded four potential suspects from this mixture. The partial profile from the major contributor to this mixture was an unidentified male, but the "partial Y-STR . . . profile of the minor contributor to this mixture matches" Appellant's Y-STR profile. The probability of randomly selecting an unrelated male individual having a Y-STR profile matching the minor contributor to this mixture is approximately 1 in 59."

Appellant's argument relies on *State v. Phillips.*[7] In *Phillips,* our supreme court found the trial court abused its discretion in admitting the State's DNA analyst's expert testimony, and the error was not harmless. This case is distinguishable from *Phillips* because here, before the State elicited evidence of Agent DeWane's findings, Agent DeWane testified as to the methodology SLED employs in performing a DNA analysis. Further, the trial court in *Phillips* did not conduct a *Daubert*/*Council* hearing prior to admission of the expert testimony. This meant that "not only could the judge [in *Phillips*] not establish a record of the basis for his decision, but [there was] nothing for the appellate courts to review because there was no evidence received." Also, the DNA analyst and the assistant solicitor in *Phillips* both misstated the analyst's findings. After noting that the test for admissibility of expert testimony under Rule 702, SCRE, was "well recognized," the court found that "for the court to exclude a portion of the DNA testimony simply because the evidence is weak and to make no reference to the fact that this item was tested, that may well mislead the jury." In the instant case, the trial court did apply the *Council* factors in performing its gatekeeping function for Agent DeWane's expert testimony. The court found that *Phillips* allows for correctly presented DNA evidence, but the evidence at issue in *Phillips* was not correctly presented, as it was in the instant case. The trial court reasoned that this case differed from *Phillips* because the trial judge here had already heard the expert witnesses *in camera* pretrial, whereas the trial judge in *Phillips* had not.

We find this case more similar to *State v. Ramsey,* 345 S.C. 607, 550 S.E.2d 294 (2001). In *Ramsey*, the appellant did not challenge the expert's qualifications based on *Council*, but rather he argued the DNA evidence was unreliable pursuant to Rule 702, SCRE, and therefore, inadmissible. Here, Appellant is not challenging Agent DeWane's qualifications, but rather the reliability of her findings. The evidence at issue in *Ramsey* was a mixture of DNA found on a bloody boot.

---

[7] 430 S.C. 319, 844 S.E.2d 651 (2020).

*Ramsey*, 345 S.C. at 611, 550 S.E.2d at 296.  The expert concluded he could not exclude the victim as one of the samples in the mixture, but reasoned "mixed samples are a reality of life in forensic testing," and the chance the DNA did not come from the victim was 1 in 4,601.  *Id.* at 611, 550 S.E.2d at 296.  Our supreme court found the trial judge did not abuse his discretion by admitting the expert testimony because Ramsey did not demonstrate the testing procedure was unreliable, much less so unreliable as to warrant exclusion.  *Id.* at 616, 550 S.E.2d at 299.  Further, the testimony concerning the DNA evidence complied with the requirements as set forth in *Council*.  *Id*.  The court found, "Any evidence concerning contamination, therefore, went to the weight of the testimony, not its admissibility."  *Id.*

We find the trial court did not abuse its discretion pursuant to Rule 702, SCRE and Rule 403, SCRE when it allowed Agent DeWane to testify that Appellant's DNA was present on the three items seized from the trash behind Appellant's girlfriend's home: the multi-tool, which was determined to be the murder weapon; a cutting from a wad of paper towels; and a cutting from a pair of Appellant's pants.  We do not find the trial court abused its discretion when it denied Appellant's motion to suppress because as this court has previously held in *Moorer*, a trial court's gatekeeping function does not require it to decide if the expert's testimony is "correct."  *Moorer*, 439 S.C. at 545, 888 S.E.2d at 735.  Here, the trial judge properly admitted the testimony and let the jury decide as to the believability of Agent DeWane's analyses.  Because there were no eyewitnesses to the kidnapping and murder, circumstantial evidence such as Agent DeWane's testimony was crucial for the jury, albeit not conclusive.  We find Agent DeWane's testimony was admissible under Rule 702, SCRE, because her expert testimony assisted the jury in understanding the results of the DNA analyses on multiple, relevant items of evidence.  Additionally, the DNA mixtures were probative of who murdered Josephson; a fact that was clearly at issue in this case.  Additionally, we find the probative value of Agent DeWane's findings was not outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury; therefore, the trial court did not abuse its discretion in admitting the testimony.

In this case, even if some portion of Agent DeWane's testimony was erroneously admitted, such error would be harmless in light of the overwhelming evidence of guilt the State presented at trial.  "Where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached,' an insubstantial error that does not affect the result of the trial is considered harmless."  *State v. Byers*, 392 S.C. 438, 447, 710 S.E.2d 55, 60 (2011) (citing *State v. Pagan*, 369 S.C. 201, 212, 631 S.E.2d 266, 267 (2006)).  An "avalanche"

of direct and circumstantial evidence was presented to the jury that placed Appellant and Josephson together at the time of the kidnapping and murder. At trial, the State noted Appellant was only taking issue with 3 out of over 100 items that had been tested for DNA. Even if there was error in admitting some portion of Agent DeWane's testimony, any such error would be harmless when considering the totality of the evidence against Appellant.

## IV.   CONCLUSION

Based on the foregoing, the decision of the trial court is

**AFFIRMED.**

**MCDONALD, J., and VERDIN, A.J., concur.**